IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 2, 2016 Session

**STATE OF TENNESSEE v. MAURICE BROWN, SR.**

**Appeal from the Criminal Court for Shelby County**
**No. 1300525   Chris Craft, Judge**
_____

**No. W2015-00466-CCA-R3-CD  -  Filed November 7, 2016**
_____

The Defendant, Maurice Brown, Sr., appeals from his convictions for two counts of felony murder, aggravated child abuse of a child under eight years old, aggravated child neglect of a child under eight years old, and resisting official detention, for which he received an effective sentence of life plus eighteen years.  On appeal, the Defendant contends that the evidence was insufficient to support his convictions.  Upon reviewing the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

John Keith Perry, Jr., Southaven, Mississippi, for the appellant, Maurice Brown, Sr.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Jennifer Nichols and Reginald Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The evidence presented at trial established that the Defendant severely beat his three-year-old son, causing injuries that resulted in his death.  The Defendant then disposed of the victim's body in a dumpster.

## The State's Proof

Mrs. Latoya Kanneh, the victim's mother and the Defendant's former girlfriend, testified that she and the Defendant had a volatile relationship and that they communicated primarily through her sister. During the rare occasions in which they spoke over the telephone, the conversations were not pleasant, and Mrs. Kanneh stated that the Defendant was always angry. She denied preventing the Defendant from seeing the victim and their daughter.

In May 2012, Mrs. Kanneh, who was living in Arkansas, decided to allow the victim to live with the Defendant for a few months. She explained that the victim was misbehaving in daycare and that she believed that the Defendant would be able to calm the victim. She planned to return to Memphis to retrieve the victim before his birthday in late July.

Ms. Kanneh testified that on Saturday, June 30, 2012, she and the Defendant argued over the telephone because the Defendant wanted her to drive to Memphis and retrieve the victim. Mrs. Kanneh told the Defendant that she could not drive to Memphis but offered to meet him halfway. The Defendant became angry and began cursing her and calling her names. Mrs. Kanneh told the Defendant that she would return for the victim before the victim's birthday and that the Defendant was to communicate with her through her mother or her sister. Mrs. Kanneh also spoke to the victim, who stated that he was ready to come home. She heard the Defendant in the background telling the victim what to say.

On Sunday, July 1, at approximately 11:00 p.m., police officers contacted Mrs. Kanneh and informed her that the victim was missing. She and her husband traveled to Memphis where she and her relatives began searching for the victim. Mrs. Kanneh later learned that the Defendant had been arrested and went to the jail to speak to him. Mrs. Kanneh stated that when she asked the Defendant what had happened to the victim, he told her that he had awaken to find the victim gone. The Defendant was crying and told her that he loved his children and that he would never harm them.

On July 3, after the victim's body had been found, Mrs. Kanneh went to the police department to make a statement and identify a photograph of the deceased victim. She said that the Defendant called her from jail while she was making funeral arrangements for the victim. When she informed him that she was making the funeral arrangements, the Defendant told her that she and his girlfriend needed to try to find an attorney to represent him. Mrs. Kanneh said she hung up on him because he failed to show any concern about the fact that she had to make funeral arrangements for the victim.

Ms. Teaira Duncan, the Defendant's former girlfriend, testified that in July 2012, she was living with the Defendant, their one-year-old son, and the victim and that both she and the Defendant were working at Wendy's. On July 1, 2012, the Defendant, along with the victim and their son, dropped her off at work for her 3:00 p.m. to midnight shift. At that time, Ms. Duncan did not notice any marks or bruising on the victim.

Ms. Duncan said that during a telephone conversation with the Defendant at 8:30 p.m., the Defendant told her that the victim had urinated on himself. Ms. Duncan did not recall the Defendant stating his plan for disciplining the victim. She said that around 10:00 p.m., the Defendant called her and said that the victim had run away. Ms. Duncan instructed the Defendant to call the police. When Ms. Duncan later returned to their apartment, police officers were present, and the Defendant was holding their son.

Ms. Duncan told the police that the victim was not spanked often but that when he was spanked, the Defendant did it. After the Defendant spanked the victim one and one-half weeks prior to the victim's disappearance, Ms. Duncan noticed a bruise on the victim's right cheekbone. The Defendant told her that the bruise occurred when the victim ran away as the Defendant was spanking him.

Ms. Duncan said that while she did not have an opportunity to look around their apartment on July 1, she did so on July 3, the day before the victim's body was discovered. She observed a hole in the closet door in the bedroom with blood, a hole in the wall of the front bedroom, and blood on a pipe that ran to the bathroom wall. She stated that she had not previously noticed the holes and blood.

On cross-examination, Ms. Duncan testified that she never saw the Defendant display any anger or aggression toward their son or the victim and that the Defendant seemed like a loving father. Ms. Duncan did not notice that the Defendant's attitude toward the victim changed following the Defendant's conversation with Mrs. Kanneh. Ms. Duncan did not recall the Defendant's being angry when he told her that the victim had urinated on himself.

Ms. Duncan said the victim typically ran away when he was going to be spanked. She never saw the Defendant become angry or abusive when the victim fled. She did not believe that the victim needed medical care where he sustained the injury to his cheekbone while fleeing from a spanking by the Defendant one and one-half weeks prior to his disappearance. Ms. Duncan recalled that on a day prior to the victim's death, he hit his head, resulting in a small knot.

Ms. Duncan clarified that her testimony was not that the hole in the wall in the front room occurred while she was at work on July 1 but that she had not noticed it before that date. She said that the hole was in an area where the playpen had been. She told the

police officers that the hole in the bedroom closet door could have been made with a fist and that she was fairly certain that the hole was not there before she left for work on July 1. On redirect examination, Ms. Duncan stated that she informed the officers that the hole in the closet door could have been caused by a fist or a head but that she believed it was made with a fist.

Mr. Terrance Pope, a friend of the Defendant, testified that on July 1, 2012, he went to the Defendant's apartment where he and the Defendant composed rap music while the children were playing in the living room. Mr. Pope said that the victim did not appear to have anything wrong with him. The Defendant was talking on the telephone while the children were playing. Mr. Pope did not notice any damage to the apartment. He left the Defendant's apartment at approximately 4:40 p.m. and learned that the victim was missing the following day when he saw the news report. The Defendant did not respond to Mr. Pope's calls or text messages. Mr. Pope acknowledged that in June 2011, he pled guilty to facilitation of aggravated robbery.

On cross-examination, Mr. Pope testified that while he was at the Defendant's apartment, the Defendant did not appear to be angry and did not display any abusive behavior toward the victim. Mr. Pope did not see any markings or bruises on the victim.

Ms. Sharon Toole lived in the apartment next to the Defendant's apartment, and they shared an interior wall. Ms. Toole testified that on Sunday, July 1, 2012, at approximately 6:00 or 7:00 p.m., she awoke from a nap when she heard a loud noise coming from the Defendant's apartment. She went into her living room where she heard the noise again. She described the noise as a "thumping" sound that continued for a few minutes and said it sounded as if someone was fighting. She then heard loud music coming from the Defendant's apartment and did not hear the "thumping" sound again. Ms. Toole returned to her nap.

Ms. Toole stated that when she later awoke, she looked out of a window and saw the Defendant placing something into his car. She said the Defendant's face was sweaty and that he appeared to be nervous and in a hurry.

Ms. Toole later exited her apartment when she saw police officers outside. The Defendant's apartment door was open, and Ms. Toole saw the Defendant sitting on a couch with his younger son. The Defendant appeared to be crying, and Ms. Toole asked him what was wrong. She said the Defendant told her that the victim was missing after he had left the apartment while the Defendant was sleeping. Ms. Toole had never seen the victim alone outside of the apartment but had always seen him with an adult. While Ms. Toole assisted in searching for the victim, she did not see the Defendant assist in the search. She stated that the Defendant "appeared like he was concerned but not

concerned. He wasn't looking for the little boy…. [H]e was just standing around watching the police officers and watching everybody else look for him."

Ms. Toole testified that later that night, the Defendant told a neighbor and her that while he was sleeping on the couch, the victim opened the door and left. When Ms. Toole asked him about the victim's ability to open a door by himself, the Defendant told her that the victim knew how to open doors.

On cross-examination, Ms. Toole testified that she did not see anyone enter the Defendant's apartment that day and play music. She acknowledged that she did not know who was inside the Defendant's apartment when she heard the "thumping" noises. She also acknowledged that she told police officers that she last saw the Defendant at approximately 3:00 p.m. that day. On redirect examination, Ms. Toole stated that on prior occasions, she had heard the Defendant yelling at his children and his girlfriend.

Mr. Christopher Sammons, who lived in the apartment above the Defendant's apartment, testified that on July 1, 2012, at approximately 7:00 or 8:00 p.m., he was on a balcony in front of his apartment smoking a cigarette when he saw the Defendant walk out of his apartment with one of his sons on his shoulder. Mr. Sammons said the Defendant appeared to have been holding the older of the two boys. The boy's head was lying on the Defendant's shoulder as the Defendant walked toward the parking lot. Mr. Sammons was unsure whether the Defendant saw him. Mr. Sammons stated that earlier that day, he heard a "bang" coming from his closet where the air conditioning unit was located, but the noise did not concern him at the time.

Mr. Sammons said he assisted in searching for the victim later that night. He overheard the Defendant talking on his telephone and stating that the victim had walked out of the apartment while the Defendant was sleeping. Mr. Sammons recalled that the Defendant appeared distraught.

When the Defendant called 911 at 10:22 p.m., he spoke to Cassandra Berry, and the recording of the call was played to the jury. The Defendant reported that he had fallen asleep around 8:30 or 9:00 p.m. while the victim was watching television. He stated that when he awoke, the victim was gone.

Officer Jodi Ledford of the Memphis Police Department testified that she and her partner responded to the missing child report. They met the Defendant at the front door of his apartment where he was pacing. The Defendant informed the officers that at some point after he returned home from work, he saw that the victim had urinated on himself. The Defendant stated that he changed the victim into a navy Batman t-shirt and jeans and laid him down on the couch with the Defendant's other son. The Defendant said he told

-5-

the victim to take a nap and that he would receive a spanking when he awoke. The Defendant told the officers that he fell asleep on another couch at approximately 8:30 or 9:00 p.m. He maintained that when he awoke at approximately 10:00 p.m., the victim was missing, and both the wooden interior door and the outer storm door were open. The Defendant stated that when he was unable to locate the victim after walking around the apartment searching for him, he called the police.

Officer Ledford and her partner assisted in the search for the victim by looking into vehicles. The Defendant identified his vehicle as a maroon Toyota Camry. Officer Ledford testified that when she and her partner approached the car, they noted that heat was coming from the engine and realized that the car had been driven recently. Officer Ledford stated that the Defendant had not told them that the car had been driven. When Officer Ledford questioned him about it, he said that he had driven around searching for the victim before calling the police. Officer Ledford noted that the Defendant had a scrape on his hand that appeared to be fresh and that his pants were torn down the inseam.

On cross-examination, Officer Ledford testified that the Defendant told her that his pants were his "work pants." She noted that the Defendant was wearing a uniform that included a red polo shirt from a fast food restaurant.

Ms. Lillian Wright, an assistant manager at Wendy's, testified that the Defendant was scheduled to work the 7:00 a.m. to 4:00 p.m. shift on July 1, 2012. However, Ms. Wright sent the Defendant home around 10:30 or 11:00 a.m. because he was not doing his job. At that time, Ms. Wright did not see any injuries on the Defendant's hands, and said that the Defendant's uniform, including his pants, were not damaged in any way.

Sergeant Alpha Hinds of the Memphis Police Department testified that she and Sergeant Max Newman took a formal witness statement from the Defendant at the department's felony response office at approximately 1:20 a.m. on July 2. Sergeant Hinds stated that the Defendant was not handcuffed or shackled and was free to leave at any time.

Sergeant Hinds stated that the Defendant said the victim came to stay with him because the victim's mother was pregnant and was unable to handle the victim. The Defendant also said that he had been away attending Lane College and wanted to spend time with the victim. He maintained that he had a good relationship with the victim and described the victim as "playful," hyperactive, and always smiling. The Defendant said he was in the process of obtaining custody of the victim. He denied arguing with Mrs. Kanneh about the victim staying with him but said he and Mrs. Kanneh argued about her treatment of their daughter and her failure to be attentive toward the victim.

The Defendant informed the officers that on July 1, his girlfriend was watching the victim while the Defendant was at work. The Defendant returned to his apartment at around 1:00 or 2:00 p.m., and he, the victim, and his younger son dropped his girlfriend off at her job at around 3:00 p.m. The Defendant said that upon returning to his apartment, he composed music with a friend, "Maestro," in the kitchen while his sons watched television in the living room. The Defendant stated that "Maestro" left around 7:15 or 7:30 p.m. and that the Defendant fed his sons at 7:45 p.m. His younger son then fell asleep on the couch.

The Defendant relayed to the officers that after the victim finished eating, the Defendant saw that the victim had urinated on himself. The Defendant told the victim, "I owe you one when I get up," which the Defendant explained meant that he was going to spank the victim. The Defendant told the victim to change his clothes and get into the shower. He said the victim did not take a shower but returned wearing a Batman shirt, jeans, and blue and white striped underwear. The Defendant also said that he fell asleep around 8:00 or 8:30 p.m. and that when he woke at around 10:00 p.m., he saw that the front door was open and that the victim was missing. He recalled that he and his younger son walked and drove around the area searching for the victim. He then called his girlfriend, who told him to call the police.

The Defendant denied having any disputes with anyone in the apartment complex and could not think of anyone who would have taken the victim. He said that the front interior door and the outer storm door each had two locks. He also said that when he fell asleep, both locks on the storm door and one lock on the interior door were locked. When he awoke, both doors were open. He maintained that the victim was able to open the doors by himself.

When Sergeant Hinds questioned the Defendant about an injury to his right index finger, the Defendant responded that he received the injury at work about one week prior to the interview and that he removed the scab in order to allow it to heal faster. In response to Sergeant Hinds' questions about his torn pants, the Defendant maintained that he tore his pants at Wendy's about a month prior to the interview and that the rip continued to grow larger. He explained that he began ripping the pants that night because it was the last time that he planned on wearing them.

Ms. Amy Speropoulos, a television news reporter, testified that she interviewed the Defendant on July 2. The recording of the interview was played to the jury. During the interview, the Defendant stated that he fell asleep around 8:30 p.m. and that when he awoke at around 10:00 p.m., the front door was open, and the victim was gone. The Defendant said he walked and drove around the area searching for the victim before calling the police. He criticized the search efforts by the police as "poor" and said that

many people "hate" him due to his music. When the reporter asked the Defendant about an injury to his finger, he replied that he had injured his finger at work approximately one week prior to the interview.

Following the execution of a search warrant, officers from the crime scene unit collected multiple blood samples from the Defendant's apartment. Officer David Payment testified that he found in the kitchen a wet mop with a handle that was bent to such a degree that it would break if used. Officer Lee Walker said he found a small piece of paper that appeared to have blood on it on the bathroom floor next to the bathtub, a wet towel in the kitchen that appeared to have blood on it, and a piece of a belt in the hallway. Officer Walker stated that when he arrived at the apartment, he saw the Defendant and described him as "a calm young man."

Special Agent Donna Nelson, a forensic scientist with the serology DNA unit of the Tennessee Bureau of Investigation ("TBI"), was accepted by the trial court as an expert in DNA analysis and serology. She testified that the Defendant's blood was found on the north bathroom wall, the bedroom floor, a piece of toilet paper, and the bathroom floor. Both the Defendant's blood and the victim's blood were on a towel. The blood on the PVC pipe was not human blood.

Memphis Police Lieutenant Darren Goods testified that in July 2012, he was a sergeant in the homicide bureau and was assigned to interview the Defendant. He explained that he was seeking to obtain "more of a suspect statement per se than a witness statement." Uniformed police officers transported the Defendant to the homicide office, arriving at 9:48 a.m. on July 2, and Lieutenant Goods and Sergeant Vivian Murray began obtaining biographical information from the Defendant at 10:45 a.m. The Defendant provided his name, date of birth, and address. He said he was the first person in his family to graduate high school and college. He graduated high school with honors and attended Lane College in Jackson, Tennessee, where he obtained a Bachelor of Science degree in physical education. The Defendant reported that he played basketball in high school and college but quit in college due to a dispute with one of the coaches. Lieutenant Goods stated that the Defendant did not appear to exhibit any difficulty in understanding the questions, did not appear to be under the influence of drugs or alcohol, and was cooperative.

Lieutenant Goods asked the Defendant about a small cut on his right index finger, and the Defendant said he cut his finger while performing maintenance duties at Wendy's. The Defendant mentioned that he used a white towel that officers had found in the bathroom to stop the bleeding. He asked Lieutenant Goods whether he was a Christian, and Lieutenant Goods stated that he was. The Defendant also said he was a Christian, and they discussed Christianity and making the right decisions.

-8-

Lieutenant Goods stated that before asking accusatory questions, he and Sergeant Murray wanted to view the available evidence, so they took a break from the interview and visited the Defendant's apartment located approximately five minutes away from the homicide office. At that time, the victim had not yet been located. Lieutenant Goods observed blood in the bathroom, the bathroom closet, and the bedroom. He also observed a hole in the bathroom door near the door knob, which appeared to have been created by a fist or by an object that had been shoved into the door. Lieutenant Goods stated the height of hole led to his belief that the victim's head could been shoved into the door.

Upon the officers' return, they advised the Defendant of his rights and began the interrogation around 1:55 p.m. The Defendant initially stated that he did not understand his rights. The officers explained the rights to the Defendant again and asked him whether the Defendant understood them. The Defendant replied, "I don't understand my *Miranda* rights." Lieutenant Goods stated that at that point, no one had referred to the Defendant's rights as his "*Miranda* rights." The officers told the Defendant that because he had graduated high school with honors and had a college degree, it was difficult for them to believe that he did not understand his rights. Lieutenant Goods stated that the Defendant did not indicate at that point that he wished to end the interview or speak to an attorney. After Sergeant Murray explained the rights to the Defendant a third time, the Defendant stated that he understood his rights, waived his rights, and agreed to speak with the officers.

The Defendant stated that around 7:00 or 7:15 p.m. on July 1, his friend, "Maestro," came to his apartment where they composed a rap song. "Maestro" remained at the apartment for approximately forty-five minutes and left around 7:45 p.m. The Defendant then fed the victim and his younger son, who then fell asleep on a couch around 8:00 p.m. The Defendant believed that the victim had spilled his dinner on his pants but then realized that the victim had urinated on himself. The Defendant said that while he was not going to spank the victim, he told the victim that he "owed him one" and instructed him to take a shower. Lieutenant Goods said he questioned the Defendant about the victim's ability to prepare a shower because Lieutenant Goods did not believe that a three-year-old had the ability to manipulate a faucet. The Defendant told the officers that the victim was smart and could bathe and dress himself. The Defendant clarified that while he told the victim to take a "shower," the victim knew that he meant a bath. He said the victim returned wearing a blue shirt, jeans, and underwear. The Defendant stated that he told the victim that he was going to take a nap and that he would spank the victim following the nap. The Defendant also stated that he turned on the television so that the victim could watch cartoons and that the Defendant fell asleep on a couch around 8:30 p.m.

The Defendant told the officers that when he awoke at around 10:00 p.m., the front doors were open, and the victim was not in the apartment. He said he placed his younger son on his shoulder and walked around outside looking for the victim but was unable to find him. The Defendant stated that he then drove around the neighborhood searching for the victim. He recalled that while driving around the area, he called Ms. Duncan and told her that the victim had run away from home and that Ms. Duncan instructed him to call the police.

In response to questioning by the officers regarding the type of discipline that he imposed, the Defendant said he would take away toys, games, or television privileges. The Defendant also said he would place spankings in "layaway" in that he would not spank his children right away but would wait and spank them for all of their acts of misbehavior at one time. He explained that he would spank his children on their buttocks with a small belt or on their hands using his hands, which were rough and hard as a result of manual labor. When Lieutenant Goods asked the Defendant whether he injured the victim, the Defendant insisted that he loved his children and would never do anything to harm them. The Defendant denied that an accident occurred and maintained that he did not know what happened to the victim. Lieutenant Goods told the Defendant that he did not believe him and asked the Defendant what happed to the victim. The Defendant shrugged his shoulders and said, "[T]hat's what I want to know."

Lieutenant Goods then questioned the Defendant about an altercation with Mrs. Kanneh in 2010. The argument centered around the Defendant's return to Jackson, Tennessee, where he attended college. When Mrs. Kanneh refused to drive the Defendant back to Jackson as planned, the Defendant took Mrs. Kanneh's car keys; they argued; and Mrs. Kanneh threated to call the police. The Defendant told the officers that "b**** f***ed up my life" and said he lost his job at Youth Villages as a result of the altercation.

Lieutenant Goods testified that while the Defendant was discussing the victim, he was calm, direct, and articulate but that once he began discussing Mrs. Kanneh, he became agitated and demonstrative. Lieutenant Goods stated that the Defendant was flailing his arms, raising his voice, and cursing, and Lieutenant Goods described the Defendant as "a totally different person." When Sergeant Murray brought the Defendant's change in behavior to his attention, the Defendant said he did not want to speak to Sergeant Murray and turned back to face Lieutenant Goods, who informed the Defendant that the Defendant could not control the interview. Lieutenant Goods told the Defendant that he was disappointed and had lost respect for him. Lieutenant Goods also told the Defendant that although the Defendant claimed to be a Christian, he would not make the correct decision. At that point, the Defendant said he no longer wanted to talk to the officers and requested counsel. The interview then ended.

On cross-examination, Lieutenant Goods testified that he did not measure the size of the hole in the bathroom door, the height of the door, or the Defendant's hand. He did not have any measurements of the victim's head. He did not see a baseball bat or any sharp objects in the Defendant's apartment.

Lieutenant Goods stated that the Defendant did not indicate any animosity toward the victim and that nothing in his supplemental report indicated that the Defendant had previously been suspected of abusing his children. Lieutenant Goods interviewed Ms. Duncan, who informed him of a prior incident in which the victim had a mark on his cheek that he sustained during the course of the Defendant spanking him.

On redirect examination, Lieutenant Goods testified that Ms. Duncan told him that after she returned from work one evening, she noticed that the victim was limping and questioned the Defendant about it. The Defendant told her that he made the victim hold his arms out for a length of time and then made the victim run from the front door to the threshold of the kitchen. When Ms. Duncan questioned the victim, he told her that he had to "exercise."

Officer Jonas Holguin with the Project Safe Neighborhoods Unit of the Memphis Police Department testified that he was asked to obtain records from the Defendant's cellular phone. According to the records, the Defendant sent eleven text messages to Ms. Kanneh's cellular phone number between 5:11 a.m. and 5:31 a.m. on July 1, 2012. The Defendant received two text messages from Ms. Kanneh at 5:18 a.m. on July 1. The Defendant placed six calls to Ms. Kanneh number between 5:44 a.m. and 6:15 a.m., and each call lasted less than one second. The Defendant did not call Ms. Kanneh again until after the victim had been reported missing.

Officer Holguin also testified regarding a number of incoming and outgoing calls to a telephone number identified as belonging to Wendy's. On July 1, 2012, the Defendant received a call from Wendy's at 8:38 p.m. that lasted two minutes, a call at 8:40 p.m. that lasted 1.7 seconds, and a call at 10:19 p.m. that lasted .7 seconds. The Defendant placed a call to Wendy's at 10:15 p.m. that lasted 1.32 seconds. The Defendant placed this call at a different location from where he had placed the earlier calls. Officers had not been searching for the victim in this location. Officer Holguin directed officers to the area where the Defendant had placed the 10:15 p.m. call, and the officers discovered the victim's body.

Memphis Police Officer Darrell Cherry testified that during the afternoon of July 3, 2012, he and his partner were searching for the victim in an area in downtown Memphis when they came upon an alley with dilapidated apartments with a dumpster

sitting by itself. Officer Cherry and his partner looked inside the dumpster where they found the victim's body.

Lieutenant Anthony Mullins testified that in July 2012, he was a sergeant in the homicide bureau and was assigned as case coordinator. He was also accepted by the trial court as an expert in crime scene investigation and blood stain pattern analysis. When Lieutenant Mullins was assigned to the case, the case was still considered a missing person's investigation. After obtaining a search warrant, Lieutenant Mullins went to the Defendant's apartment to view the scene. Lieutenant Mullins identified multiple blood stains throughout the apartment.

Lieutenant Mullins testified that the Defendant's cellular telephone data revealed that the Defendant had placed a call from a location outside of the search area. As a result, officers began searching the area from which the call was placed, and the victim's body was located in a dumpster in that area. Lieutenant Mullins then went to the location of the dumpster. He said that the heat index on July 3, the day on which the victim was discovered, was more than one hundred degrees. The discovery drew the attention of the media and onlookers, and the police officers were not able to obscure onlookers' view of the dumpster. At that time, the victim had not been positively identified, and the victim's mother had not been informed of the discovery. Lieutenant Mullins said that as a result, he decided to have the dumpster transported to a large garage bay area at the office of the crime scene investigation unit.

Allied Waste, the owner of the dumpster, transported it to the office. Lieutenant Mullins said that while he wanted to have the dumpster transported as soon as possible, he knew that the transportation had to be performed slowly to limit the movement of the contents. He stated that multiple photographs were taken both before and after the dumpster was transported to document the movement of the contents. Once the dumpster arrived at the garage bay area, officers photographed each layer of trash as it was removed.

Lieutenant Mullins testified that the victim's body was originally close to the front of the dumpster but that the victim's body had shifted "slightly" when the dumpster was transported. The orientation of the victim's body following the transfer was similar to the orientation in which his body was discovered. Lieutenant Mullins stated that the trash inside the dumpster did not include bricks, bats, knives, or anything that could have damaged the victim's body. Rather, the trash included "soft" items, such as styrofoam cups, can, and paper and plastic items. The only large, heavy object in the dumpster was a cushion or car seat.

Lieutenant Mullins stated that officers obtained a statement from Ms. Duncan and another search warrant of the Defendant's apartment based upon that statement. Ms. Duncan identified blood in the bathroom, damage to a door, and an impression in a wall that she said she had not seen before she had left for work on the night of the victim's disappearance.

On July 4, Lieutenant Mullins observed the victim's autopsy, and after obtaining the preliminary findings and other evidence, he determined that the Defendant should be charged with the victim's homicide. Lieutenant Mullins said the Defendant had already been charged with aggravated child neglect or endangerment of the victim and was in custody in the Shelby County Jail. Lieutenant Mullins explained that while the Defendant's additional first degree murder charge was to be included under the Defendant's prior booking number, the new charge was considered a "new arrest" for purposes of documenting the charge for the jail. A new "arrest ticket," affidavit of complaint, and bond recommendation had to be filed, and a new thumbprint from the Defendant had to be obtained.

Lieutenant Mullins testified that on July 6, 2012, two officers brought the Defendant from the jail to the homicide office. The Defendant was placed in a large interview room, and his leg was shackled to an iron bench. Lieutenant Mullins said that because the Defendant had previously invoked his right to counsel, the officers were not allowed to interview him. Rather, Lieutenants Mullins and Goods explained to the Defendant that they needed to obtain his thumbprint due to the new charge, and the Defendant declined to cooperate. Lieutenant Mullins said that when he told the Defendant that he was required to provide a thumbprint, the Defendant requested counsel. The officers told the Defendant that they needed his thumbprint as part of the arrest process, the Defendant again refused to provide a thumbprint.

Lieutenant Mullins stated that the Defendant tucked his arms inside of the sleeves of his shirt. The officers removed the Defendant's shirt, but the Defendant kept his arms pressed tight against his torso. Lieutenant Mullins called in three other officers to assist. They attempted to hold the Defendant down on the table, but he continued to squirm. Two of the officers left the room because it was too difficult to maneuver in such a small area. Lieutenant Mullins said the Defendant would swing his elbows and occasionally his fists to prevent the officers from obtaining his thumbprint. Lieutenant Mullins stated that Lieutenant Goods was able to pin the Defendant down on the table, while another officer held the Defendant in "kind of like a headlock." The officers were able to stretch out the Defendant's arm but were unable to remove his thumb from inside of his fist. Lieutenant Goods left the room to obtain chemical agent spray. Meanwhile, the Defendant was able to get his arm away from the officers and back around his torso. Lieutenant Mullins said that after the Defendant refused to place his arm back on the

-13-

table, Lieutenant Mullins struck the Defendant once in the lower back with his fist, and the Defendant stuck out his arm. The Defendant refused to remove his thumb from inside of his fist. Lieutenant Mullins ordered the Defendant to release his thumb, and the Defendant refused. Lieutenant Mullins used his elbow to strike the Defendant on his arm on three occasions, but the Defendant continued to refuse to display his thumb. Lieutenant Mullins explained that he struck a nerve in the Defendant's arm in order to cause the Defendant's hand to numb. Lieutenant Goods returned and sprayed the Defendant with the chemical agent from about four feet away. The officers were then able to obtain the Defendant's thumbprint. Lieutenant Mullins stated that as a result of the encounter, the Defendant was charged with resisting official detention.

Lieutenant Mullins testified that the Defendant had the opportunity to clean out his eyes and was able to walk without assistance. Lieutenant Mullins stated that the Defendant was proud that the efforts of five officers were required to obtain his thumbprint and loudly boasted to everyone within earshot.

On cross-examination, Lieutenant Mullins testified that when the Defendant was brought to the homicide office, the officers told the Defendant that he was being charged with the victim's murder. Lieutenant Mullins said that while the Defendant was swinging his elbows and fists, the officer did not recall the Defendant striking any of the officers. Lieutenant Mullins said that had the Defendant struck an officer, he would have been charged with assault. The Defendant filed a complaint against Lieutenant Mullins with the internal affairs division of the police department, and the complaint was resolved prior to the indictment.

On redirect examination, Lieutenant Mullins testified that he believed that the Defendant was charged with resistance on the same day in which he was charged with first degree murder and that the resistance charge had to be added to the arrest ticket. The resistance charge was filed before the Defendant filed the complaint with the internal affairs division. The Defendant also filed a federal civil rights lawsuit against Lieutenant Mullins and Lieutenant Goods.

The State introduced recordings of multiple telephone calls that the Defendant made from the jail from July 2 to July 4, 2012. During the calls, the Defendant declared his innocence and attempted to make arrangements to retain an attorney.

Dr. Karen Chancellor, a medical examiner and forensic pathologist, performed the autopsy on the victim. The victim was forty inches long and weighed thirty pounds. He was wearing a blue Batman t-shirt, jeans, and blue and white underpants that were heavily soiled with feces. Dr. Chancellor testified that while bowel movements cannot occur after death, some people have bowel movements while in the process of dying.

-14-

She said that because she believed that the victim was deceased by the time that he was placed inside the dumpster, the fecal soiling likely occurred before then.

Dr. Chancellor testified that because the victim's body was in the early stages of decomposition, she took a conservative view in determining whether the multiple areas of discoloration on the victim's body were bruises or injuries. She observed multiple bruises or contusions on the front of the victim's chest, the front of his abdomen, his legs and arms, and his torso. The victim had a rectangular bruise on the right side of his abdomen and a triangular bruise in the area of the front torso. Dr. Chancellor observed swelling in the middle of the victim's forehead with an abrasion above the swelling. She also observed abrasions on the right side of the victim's neck, the back of his head, and the top of his head, as well as a laceration on the back of his head.

Dr. Chancellor stated that the victim's liver was lacerated and that 250 cubic centimeters of blood, which amounted to about twenty-five percent of the victim's total blood volume, was in his abdominal cavity. She said the laceration in the liver would have caused the victim to lose blood rapidly. The sixth, seventh, eighth, and ninth ribs on the right side of the victim's body were fractured, and the victim sustained two fractures in the seventh rib on the left side of his body.

Dr. Chancellor testified that the victim had subdural hemorrhages to both sides of his brain, indicating that he suffered a head injury. She also noted deep tissue hemorrhages to his upper right arm, his left elbow, his left forearm, his left shoulder, the posterior of his left thigh, the lateral portion of his right thigh, the medial portion of his right thigh, and back of his left leg, and his right buttock. Dr. Chancellor saw blood on the front of the victim's underpants and red discoloration at the tip of the victim's penis. She said that because the area showed bleeding, the injury occurred prior to the victim's death.

Dr. Chancellor testified that the cause of the victim's death was multiple blunt force injuries to his head, chest, and abdomen. She said the object used to inflict the injuries did not have a sharp edge. She also said the injuries to the victim's liver and brain occurred prior to his death. She stated that after the victim's liver was lacerated, he could have survived minutes to hours but would not have been acting in a normal fashion. She also stated that the laceration to the liver alone would have resulted in the victim's death.

On cross-examination, Dr. Chancellor testified that the victim's cause of death was all of the injuries to his head, chest, and abdomen, including the rib fractures. She was unable to determine the order in which the injuries were inflicted. She said the rib fractures could have resulted in death because they interfered with the act of breathing.

-15-

Dr. Chancellor stated that the victim's rib fractures were accompanied by soft tissue hemorrhage, while rib fractures caused by cardiopulmonary resuscitation after a person is dead do not have bleeding around them.

Dr. Chancellor stated that a blunt force injury can occur if a person runs into an object or is thrown into an object. She said that while it was possible that the victim's head injury could have resulted from the victim running into a hard object, it was unlikely. She did not believe that the victim running into a table or wedging himself in between a table and another object could have caused the victim's injuries. She said the victim appeared to be well nourished and acknowledged that bruises can occur after death. On redirect examination, Dr. Chancellor testified that while one or two of the bruises may have occurred after the victim had died, the majority of his injuries occurred prior to his death.

**The Defense Proof**

The Defendant testified in his own defense and said that while his relationship with Mrs. Kanneh ended in 2008, they continued working together to raise their children. In 2010, the Department of Children's Services removed the victim and his sister from Mrs. Kanneh's home for three or four months. The Defendant said that he saw a change in the victim upon his return. The Defendant stated that while the victim was a good child, he was hyperactive and believed that he could do whatever he pleased. The Defendant also stated that he disciplined his children by taking away their toys and television privileges, requiring them to go to another room and sit, or requiring them to "run the energy off."

The Defendant testified that in May 2012, the victim was acting out in school and had pulled his pants down in front of his teacher. The victim came to stay with the Defendant because Mrs. Kanneh was unable to control the victim's behavior. The Defendant denied that the victim caused any problems that summer and denied that he wanted the victim to leave. The Defendant said he and Mrs. Kanneh agreed that she would pick up the victim on June 30. The Defendant did not recall speaking to Mrs. Kanneh on June 30 but said they spoke a few days before June 30, during which they argued about their daughter. The Defendant did not believe that Mrs. Kanneh treated their daughter and the victim equally and said that their daughter was supposed to visit him but had not done so. He denied that they argued about the victim or that he was mad at the victim following his conversation with Mrs. Kanneh. He maintained that he did not allow any of his arguments with Mrs. Kanneh to affect his behavior with his children.

The Defendant stated that Mrs. Kanneh's sister was supposed to pick up the victim on June 30 but did not do so. He said he began calling and texting Mrs. Kanneh on the

-16-

morning of July 1 to ascertain Mrs. Kanneh's plan because he was scheduled to begin his shift at 7:00 a.m. He also said that Mrs. Kanneh responded via text that her sister would pick up the victim later in the day, but he stated that her sister never came.

The Defendant maintained that on the morning of July 1, he was working for the general manager at Wendy's instead of for Ms. Wright. He explained that he volunteered to leave early because business was slow and employees were being sent home. He said Mr. Pope arrived at his apartment at approximately 3:30 p.m. and stayed for approximately forty-five minutes. After Mr. Pope left, the Defendant continued to compose music in the kitchen while the children played in the living room. He fed his children around 7:45 p.m., after which his youngest son fell asleep on the couch.

The Defendant testified that after the victim finished eating, the Defendant saw that the victim had urinated on himself and told the victim, "You know better than that, and so I owe you one." Ms. Duncan called, and the Defendant informed her that the victim had urinated on himself. Ms. Duncan then talked to the victim, while the Defendant prepared the victim's bath. The Defendant returned to speak to Ms. Duncan and instructed the victim to remove his shorts. The Defendant said that after speaking to Ms. Duncan, he returned to the bathroom where he observed the victim with a towel; and the victim was splashing water everywhere. The Defendant told the victim that he was going to be spanked, and the victim ran out of the bathroom.

The Defendant stated that he generally spanked the victim with a small belt. The Defendant used his hands to estimate the length of the belt to the jury as approximately six inches. He said that when the victim ran out of the room, the Defendant "swiped" at him. The victim then "flipped on the bed into the headboard" and ran into the closet door, while the Defendant "swiped" at him. The victim ran down the hallway, and the Defendant "swiped" at him again. The Defendant stated that the victim was not paying attention and ran into the corner of the bedroom door. The victim got up and ran into the kitchen, while the Defendant "swiped" at him. The victim ran behind a steel chair and then under the table when the Defendant began spanking him. The Defendant said that "by this time, I'm swiping him and he's jumping back and forth, hitting his head, and I'm swiping him, swiping him, swiping him." The Defendant maintained that the victim hit his head on the table while getting out from under the table and ran into the living room where the Defendant continued to spank him. According to the Defendant, the victim ran into the couch, and the Defendant continued to spank the victim as the victim ran around the living room. The Defendant said the victim ran into the television and became wedged between the couch and a wall, while the Defendant spanked him. The victim was able to free himself and ran while the Defendant spanked him. The victim ran into the corner of the couch and fell as the Defendant continued to spank him. The victim got

up and ran, and the Defendant chased him. The Defendant stated that the victim stopped by the closet and grabbed the Defendant's belt. The Defendant testified,

> And I started spanking him everywhere. On his legs, on his back, on his stomach, on his chest. Everywhere. Just to get him to let go of the belt. And I snatched the belt out of his hand, and that's when I held him by one arm and hit him like four more times.

The Defendant said at that point, he hit his hand on the closet door and injured his finger. The victim escaped and ran into the doorknob.

The Defendant testified that he walked into the bathroom, wrapped a towel around his finger, and turned off the bath water. When the Defendant returned, the victim was in the corner holding his head. The Defendant instructed the victim to come over to him and told the victim that he needed to stop misbehaving and to "get up in there," while the Defendant cleaned up the water in the bathroom. The Defendant said that the victim ran into the kitchen and vomited on the floor and that he scolded the victim for failing to vomit in the trash can. The Defendant stated that the victim believed that he was going to receive another spanking and ran into the bathroom where he slipped, fell, and hit his head. The Defendant said that the victim's eyes rolled in the back of his head but that the victim "came back." The Defendant dried off the victim with a towel and noticed a cut on the victim's face. The Defendant laid the victim down in the bedroom, while he cleaned up the vomit in the kitchen. The Defendant said he checked on the victim and saw that the victim was sleeping. After cleaning up the water in the bathroom, the Defendant checked on the victim and believed that the victim was in a deep sleep. The Defendant stated that when he checked on the victim a third time, the victim was not breathing.

The Defendant testified that he laid the victim down on the floor and performed CPR but was unable to revive him. He said he put on the victim's clothes, placed the victim on his shoulder, left the apartment, and placed the victim in the backseat of his car. After returning to the apartment to retrieve his youngest son, the Defendant said he began driving toward the hospital. He maintained that he panicked and started to drive toward his mother's home. He then pulled into an alleyway, began crying, and called Ms. Duncan. He said he then threw the victim into a dumpster and left the scene.

The Defendant stated that he "made up a story" about the victim's disappearance "to cover [his] butt" and "started running with the story." He acknowledged that he lied to the 911 operator, the police officers, and the news reporter. He maintained that he was scared and in shock, was being selfish, and did not know who to trust. He also

acknowledged that when he placed the telephone calls from the jail, he was trying to cover up his actions.

The Defendant was in custody when he met with Lieutenant Mullins on July 6. The Defendant testified that when he questioned why the officers needed his thumbprint, Lieutenant Mullins grabbed his arm and began twisting it and demanding his thumbprint. The Defendant said he was scared and "just balled up." He said that Lieutenant Mullins punched him in his back, his elbow, and on top of his head and that Lieutenant Goods ran out of the room to obtain the chemical spray. The Defendant maintained that he provided his thumbprint when he saw the chemical spray but that the officers sprayed him anyway and left him crying on the floor.

On cross-examination, the Defendant testified that while he spanked the victim, he was not responsible for the victim's death. The Defendant denied causing the victim's injuries and kicking the victim and said that some of the marks were not on the victim's body when the Defendant put the victim's clothes on following his death. The Defendant also denied that he told the police that he would save up spankings until the victim misbehaved badly.

The Defendant denied that he refused the officers' request for a thumbprint and placed his hands inside of his shirt. He maintained that the officers removed his shirt while beating him.

At the conclusion of the trial, the jury convicted the Defendant of felony murder in the perpetration of aggravated child abuse, felony murder in the perpetration of aggravated child neglect, aggravated child abuse of a child under the age of eight, aggravated child neglect of a child under the age of eight, and resisting official detention. The court merged the two felony murder convictions and the aggravated child abuse and aggravated child neglect convictions. The trial court sentenced the Defendant to life imprisonment for felony murder in the perpetration of aggravated child abuse, eighteen years for aggravated child abuse, and six months for resisting official detention. The court ordered that the Defendant's sentence for aggravated child abuse run consecutively to his sentence for felony murder and concurrently with his sentence for resisting official detention, for an effective sentence of life imprisonment plus eighteen years.

## ANALYSIS

The Defendant asserts on appeal that the evidence presented at trial was insufficient to support his convictions. When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn.1982).

This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

## A. Felony Murder, Aggravated Child Abuse, and Aggravated Child Neglect

As relevant to this case, felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse [or] aggravated child neglect." T.C.A. § 39-13-202(a)(2). Aggravated child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury" and the act of abuse "results in serious bodily injury to the child." *Id.* §§ 39-15-401(a), -402(a)(1). Aggravated child neglect occurs when a person "knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare" and the act of neglect "results in serious bodily injury." *Id.* §§ 39-15-401(b), -402(a)(1). If the victim is under the age of eight, aggravated child abuse and aggravated child neglect are Class A felonies. *Id.* § 39-15-402(b).

The Defendant asserts that the State failed to establish that he "knowingly" committed aggravated child abuse and aggravated child neglect. The term "knowing"

> refers to a person who acts knowingly with respect to the conduct or the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts

-20-

knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

*Id.* § 39-11-302(b). Aggravated child abuse and aggravated child neglect are classified as nature-of-conduct offenses and not result-of-conduct offenses. *Dorantes*, 331 S.W.3d at 386 (citing *State v. Hanson*, 279 S.W.3d 265, 276-77 (Tenn. 2009); *State v. Ducker*, 27 S.W.3d 889, 897 (Tenn. 2000). For example, to establish child abuse as a nature-of-conduct offense, the evidence must be sufficient to establish that "the defendant was aware of the nature of his conduct when he treated the victim in such a manner as to inflict injury, and that, in doing so, he acted other than by accidental means." *Dorantes*, 331 S.W.3d at 386 (citing *Hanson,* 279 S.W.3d at 277). "[T]he Tennessee child abuse and neglect statute is clear that 'knowingly' modifies 'treats' or 'neglects.'" *Ducker*, 27 S.W.3d at 897. To establish aggravated child abuse, "it is the actual act of treating a child in an abusive manner that must be knowing conduct; a defendant need not know that his or her conduct will result in serious bodily injury." *State v. Prater*, 137 S.W.3d 25, 33 (Tenn. Crim. App. 2003). Likewise, if a defendant knowingly neglects a child so as to adversely affect the child's health and the child suffers serious bodily injury as a result, the defendant has committed aggravated child neglect, regardless of whether the defendant knew what the result of the neglect would be. *See Ducker*, 27 S.W.3d at 897.

The evidence, when viewed in a light most favorable to the State, established that while the victim was under the Defendant's sole custody and care, the victim sustained a severe head injury, multiple fractured ribs, a lacerated liver, and numerous bruises all over his body. While the Defendant asserts that the injuries were caused by the victim falling and running into various objects and during the transportation of the dumpster to the crime scene offices, the jury chose to reject the Defendant's testimony that the victim's injuries were self-inflicted. The jury, rather, credited Dr. Chancellor's testimony during which she rejected any suggestion that the injuries were caused by the victim running into hard objects as unlikely and her testimony that the majority of the victim's injuries occurred while he was still alive and before he was placed inside the dumpster. It was within the province of the jury to assess witness credibility and determine the weight and value to be given to the evidence. *Bland*, 958 S.W.2d at 659. Moreover, given the extent and nature of the injuries sustained, the jury could reasonably infer that the victim would not continue to inflict severe injuries on himself.

The State presented proof that Defendant was angry at the victim's mother because she had not picked up the victim as planned and that the Defendant no longer wanted the victim to live with him. While the victim sustained injuries, the Defendant injured his hand, and it began to bleed. A hole or indention was discovered in a door in the apartment, and the Defendant's blood was found in multiple rooms throughout the apartment. The Defendant offered differing accounts to the police and at trial regarding

how and when he sustained the injury. Prior to the victim's disappearance, neighbors reported hearing noises from the apartment, sounding as if a fight was occurring. Based upon the wet mop and the towel with both the blood of the Defendant and the victim that were recovered from the scene, the jury could reasonably infer that the Defendant attempted to clean the apartment following the assault. The Defendant drove the victim to an isolated area and disposed of his body inside a dumpster. While the Defendant maintained that he placed the victim's body in the dumpster because he panicked, the jury could reasonably infer that he attempted to dispose of the victim's body in an effort to conceal his actions in beating the victim. The Defendant attempted to explain the victim's disappearance by concocting a story whereby he awoke from a nap to find the victim missing. The Defendant repeated the story to police, neighbors, and the press. Witnesses reported that the Defendant seemed calm and unconcerned during the initial stages of the search for the victim.

Based upon the nature and extent of the victim's injuries which occurred while under the victim was under the Defendant's sole custody and care and the Defendant's actions in attempting to dispose of the victim's body and conceal the offenses, we conclude that the evidence is sufficient to establish that the Defendant knowingly treated the victim in such a manner as to inflict injury, that he acted other than by accidental means, and that the victim died as a result. We also conclude that the evidence is sufficient to establish that the Defendant knowingly neglected the victim so as to adversely affect the victim's health and that the victim died as a result. Accordingly, we conclude that the evidence is sufficient to support the Defendant's convictions for felony murder, aggravated child abuse, and aggravated child neglect.

### B. Resisting Official Detention

Tennessee Code Annotated section 39-16-602(a) provides:

It is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer, or anyone acting in a law enforcement officer's presence and at the officer's direction, from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another.

"Force" is defined as "compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." T.C.A. § 39-11-106(a)(12).

The Defendant asserts that the evidence is insufficient to support his conviction for resisting official detention because he was in custody on other pending charges when the officers attempted to take his thumbprint in relation to the new charges. An "arrest" is

defined as "the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest." *State v. Crutcher*, 989 S.W.2d 295, 301 (Tenn. 1999) (citations omitted). While an arrest may be affected absent formal works or a station house booking, "there must be actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer." *Id.* at 301-02.

Although the Defendant was already in custody on other charges, Lieutenant Mullins testified that the new charge of felony murder was considered a new arrest and required a new arrest ticket, an affidavit of complaint, a bond recommendation, and new fingerprinting. The Defendant was taken into custody at the jail for a new charge of felony murder and was subjected to new booking procedures as a result. By refusing to provide a fingerprint as part of the booking procedure, he was resisting the "arrest" for the new charges.

The Defendant also asserts that the evidence was insufficient to establish that he engaged in force. However, the evidence established that he placed his hands and arms inside of his shirt and swung his elbows and fists in an effort to prevent the officers from obtaining his thumbprint. We conclude that this evidence is sufficient to establish that the Defendant resisted the new arrest by force. The Defendant is not entitled to relief regarding this issue.

## CONCLUSION

Based upon our review of the record and the applicable law, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE